USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/27/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

B.R., as Parent and Natural Guardian o/b/o K.O., a student with a disability,

Plaintiffs,

-v-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

---

MEMORANDUM ORDER

11 Civ. 8433 (JSR)

JED S. RAKOFF, U.S.D.J.

Plaintiff B.R., on behalf of her child K.O., brings this action against defendant New York City Department of Education ("the Department") for relief pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2). K.O., a 9-year-old autistic child, attends the Rebecca School, a private special education school. B.R. seeks reimbursement of K.O.'s 2010-11 tuition from the Department. The parties have completed the state administrative hearing and administrative appeal process, which terminated in the Department's favor. Plaintiffs now seek review of those proceedings in this Court. The parties cross-moved for summary judgment based solely on the administrative record below, and the Court, by "bottom-line" Order dated August 22, 2012, granted B.R.'s motion for summary judgment and denied the Department's cross-motion. This Memorandum Order sets forth the reasons for that ruling.

The Individuals with Disabilities Education Act (or "IDEA") requires states receiving federal education funding to provide children with disabilities a "free appropriate public education" (or "FAPE")[1] -- an education that provides "special education and related services tailored to meet the unique needs of a particular child" that are "reasonably calculated to enable the child to receive educational benefits." 20 U.S.C. § 1412(a)(1)(A); R.E. v. N.Y.C. Dep't of Educ., No. 11-1266-cv, 2012 WL 4125833, at *1 (2d Cir. Sept. 20, 2012); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). State and federal law further require that a disabled child be educated in the least restrictive environment -- i.e., with nondisabled peers -- to the extent feasible. 20 U.S.C. § 1412(a)(5); N.Y. Educ. Law § 4402.

The special education services required by the IDEA are provided pursuant to an individualized education program (or "IEP"), which is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance,

---

[1] Unfortunately, "[t]his opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms." M.H. v. N.Y.C. Dep't of Educ. (M.H. II), 685 F.3d 217, 223 n.1 (2d Cir. 2012). One suspects that regulators and bureaucrats love such jargon because it makes even simple matters cognizable only to the cognoscenti and thus enhances their power at the expense of people who only know English. Nevertheless, acronyms have so invaded IDEA practice that this judge, like others before him, is pretty much stuck with having to use them.

and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988). The IEP is developed by a team consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). In New York, the IEP team is called the Committee on Special Education (or "CSE").

The IDEA also imposes certain procedural safeguards, including the requirement that states provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). New York has implemented a two-tiered system of administrative review. Parents wishing to challenge a proposed IEP can first have the IEP reviewed by an impartial hearing officer (or "IHO"). N.Y. Educ. Law § 4401(1). Following the IHO's decision, an aggrieved party may appeal to a state review officer (or "SRO"). N.Y. Educ. Law § 4404(2). After exhausting these remedies, a party still aggrieved may bring a civil action challenging the decision in federal or state court.[2] 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

---

[2] Oddly enough, it is still customary under the IDEA to refer to a court as a "court."

Parents dissatisfied with a proposed IEP may also unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a due process complaint with the state educational agency seeking reimbursement for the private school tuition. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005); see also Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2492 (2009) (noting that a court has "broad authority to grant appropriate relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE" (internal quotation marks omitted)). A school district will be required to reimburse the parents if the parents can establish the three so-called "Burlington-Carter" factors: (1) that the educational program recommended by the IEP was inappropriate to meet the child's needs; (2) that the alternative placement selected by the parents was appropriate; and (3) that equitable factors weigh in favor of reimbursement. R.E., 2012 WL 4125833, at *11 (citing Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Sch. Comm. of Town of Burlington v. Dep't of Educ., 471 U.S. 359 (1985)).

The relevant factual and procedural background, as drawn from the parties' Local Civil Rule 56.1 statements of undisputed facts (which in turn are drawn from the administrative record) is as follows:

K.O. is a 9-year-old child with autism. She exhibits deficits in her sensory processing, sensory integration, and fine motor skills. Plaintiffs' Local Civil Rule 56.1 Statement ("Pl. 56.1") ¶¶ 1-2.[3] She began attending the Rebecca School, a private special education school, as a kindergartner in February 2009 through agreement with the Department. Id. ¶ 5. Her curriculum at the Rebecca School provided K.O. with sensory integration services in the form of a brushing protocol;[4] exposure to various tactile toys and tactile equipment throughout the day; proprioceptive input to her joints through a trampoline housed in the sensory gym; and vestibular input in the sensory gym, including linear swinging. Id. ¶ 6.

On January 26, 2010, an IEP meeting was held to develop an educational program for K.O. for the 2010-2011 school year. Id. ¶ 9. Based on that meeting, K.O.'s IEP team made the recommendation that her IEP include the following:

- A "special class environment" in a classroom with a 6:1:1 staffing ratio (6 students per 1 teacher and 1 "paraprofessional") and a 12-month school year.
- Under the heading of "social emotional management needs": access to sensory materials; benefits from a brushing protocol; benefits from a therapeutic

[3] Where the Court cites only one of the parties' Local Civil Rule 56.1 statements, the opponent has admitted the factual assertion.

[4] A brushing protocol is a deep pressure proprioceptive protocol that involves application of deep pressure to the skin or to the body and is soothing to the recipient. It is considered a form of occupational therapy. Pl. 56.1 ¶ 7.

listening program; and benefits from the use of a picture exchange communication system book to cope with frustration.

- Under the heading of "related service recommendations": one-on-one occupational therapy three times a week for 30 minutes; one-on-one physical therapy twice a week for 30 minutes; one-on-one speech therapy three times a week for 30 minutes, and 3:1 group speech therapy once a week for 30 minutes.

See IHO Ex. 1.

At this stage, B.R., K.O.'s mother, did not lodge specific objections to the proposed recommendations but did make clear that she wanted to keep K.O. at the Rebecca School, which she, however, could not afford to do without state assistance. Pl. 56.1 ¶ 13. Subsequent IEP meetings were therefore held at the request of the IEP team on March 2, 2010 and April 15, 2010, which B.R. attended. Id. ¶¶ 14-15.

When, however, B.R. had not received a proposed placement for K.O. by the beginning of June 2010, she signed an enrollment contract with the Rebecca School on June 2, 2010 to hold K.O.'s seat, and paid a $500 deposit. By signing the contract, she was obligated to pay the Rebecca School's $92,100 tuition. Id. ¶ 17; Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Facts ("Def. Resp. 56.1") ¶ 17 (denying "assertions" but admitting to payment and contractual obligations). On June 14, 2010, however, B.R. received notice of an offer from the Department for a public school placement for K.O. (the "District 75 program"). Pl. 56.1 ¶ 19; Def. Resp. ¶ 19

(stating no basis to admit or deny, and admitting letter sent dated June 1, 2010).

B.R. subsequently visited the recommended public school. For reasons that are discussed in detail below, she decided that the school was unable to carry out the IEP's recommended program for K.O. Id. ¶ 20. B.R. kept K.O. enrolled at the Rebecca School, and, after retaining counsel, sent the Department a written explanation of her rejection on September 20, 2010. She requested an Impartial Hearing on October 21, 2010, to order the Department to pay for K.O.'s tuition. The Impartial Hearing lasted eight days between December 2010 and March 2011, and was presided over by IHO Michael Kennedy Lloyd, Esq. Id. ¶ 21-22.

The IHO issued his Findings of Fact and Decision on April 20, 2011. He found that the Department had failed to demonstrate that it had offered a genuine FAPE to K.O. and further found that K.O.'s IEP could not be implemented at the recommended school because the public school could not implement the IEP's occupational therapy recommendations and because the proposed teacher, Ms. Janelly Nieves, was not a "highly qualified special education teacher" pursuant to 34 C.F.R. § 300.18(b)(1). Id. ¶ 36. The IHO, finding the Rebecca School had an appropriate program and that the equitable factors weighed in favor of the plaintiffs, ordered the Department to reimburse B.R. the tuition deposit and pay the Rebecca School for K.O.'s tuition. Id.

The Department appealed the IHO's decision to the State Review Office ("SRO") of the New York State Education Department, arguing that the IHO erred in finding the state did not offer K.O. a free appropriate public education and that equitable considerations did not favor tuition payment. Id. ¶ 37. The SRO overturned the IHO's decision, finding that K.O.'s occupational therapy needs could be met in the classroom and that Ms. Nieves was a highly qualified special education teacher. Id. ¶¶ 38-41. B.R., on behalf of K.O., appealed the SRO's decision to this Court, seeking tuition reimbursement and attorneys' fees and costs.

The standard of review on such an appeal is somewhat Janus-like. On the one hand, the IDEA requires this Court to "conduct[] an 'independent review of the administrative record' and . . . make[] a determination based on a 'preponderance of the evidence.'" W.M. v. Lakeland Cent. Sch. Dist., 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)). On the other hand, the Supreme Court has held that such a review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).

The Second Circuit, however, has recently clarified how this somewhat uncertain standard should be applied in cases, such as this one, where the SRO has reversed the IHO and the matter then comes before a court. See M.H. v. N.Y.C. Dep't of Educ. (M.H. II), 685 F.3d 217 (2d Cir. 2012). In such a situation, the court should give substantial deference to the SRO's views of educational policy, but less to the SRO's factual findings or to its reasoning in general. Id. at 241. Thus, the Court must determine whether the SRO's decision is "well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id. at 244 (citing Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993)); see also R.E., 2012 WL 4125833, at *16 ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead.").

With this general standard in mind, the Court turns to the case at hand. In this case, unlike many other IDEA cases brought against the Department, plaintiffs do not challenge the adequacy of the programmatic elements of the IEP developed in the meetings between K.O.'s parents and the Department. Rather, they challenge only the placement of K.O. in the proposed District 75

public school, which B.R. contends does not satisfy the requirements outlined in the IEP.

Specifically, B.R. argues that the proposed placement was inadequate for three reasons: (1) because the public school could not provide K.O. with one-on-one occupational therapy as required in her IEP; (2) because the school lacked a "sensory gym"; and (3) because K.O.'s proposed teacher, Ms. Janelly Nieves, was not a "highly qualified special education teacher" as required under the IDEA and as defined pursuant to 34 C.F.R. § 300.18(b)(1). Having reviewed the parties' written and oral arguments, and the administrative record as a whole, the Court agrees with plaintiffs that the Department failed to prove that the proposed placement would provide K.O. with her IEP-recommended one-on-one occupational therapy, and therefore, without reaching the other objections, concludes that the proposed placement did not provide K.O. with the FAPE the IDEA mandates.

K.O.'s IEP team noted that K.O. required "significant sensory integration and processing needs." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment dated Feb. 24, 2012 ("Pl. Br.") at 5; <u>see</u> IHO Ex. 1 (2010-2011 IEP Plan describing K.O.'s problems with both physical development and social/emotional regulation). Her IEP for the 2010-2011 school year therefore recommended, <u>inter alia</u>, one-on-one occupational

therapy three times a week, thirty minutes per session, in a location outside the general education classroom. IHO Ex. 1 at 14; Findings of Fact and Decision of Impartial Hearing Officer Michael Kennedy Lloyd, Esq. ("IHO Dec.") at 4 (describing as "1:1 educational paraprofessional consistent with the student's documented needs of a preferred adult and her identified self-injurious behaviors"); Decision No. 11-054 of the State Review Officer ("SRO Dec.") at 3 ("three 30-minute sessions per week of individual OT"). As explained at the IHO hearing by Andrew Klein, K.O.'s occupational therapist at the Rebecca School, K.O.'s occupational therapy helps her stay calm and alert during the school day, including when she is engaged in classroom activity. Impartial Hearing Transcript ("Tr.") 1271-72. Moreover, in evaluating the appropriateness of off-site vouchers versus in-class occupational therapy, the IHO noted that it was clear that the severity of K.O.'s disability required the 1:1 occupational therapy to be provided at the school in order for K.O. to make progress. IHO Dec. at 20.

At the IHO hearing, B.R. testified that when she visited the Department's proposed school, the occupational therapist then on staff informed her that occupational therapy at the school was provided in a group of six students four days a week, inside the classroom, see Parent's Ex. A-2; Tr. at 1802. It came to light at the IHO hearing, however, that the occupational

therapist on staff at the proposed school had left the school sometime after the 2010-2011 school year began, and that the Department was instead issuing Related Service Authorizations ("RSAs") -- i.e., vouchers -- for students to receive occupational therapy outside the school. The IHO concluded that the vouchers were inadequate to implement K.O.'s IEP, IHO Dec. at 20. The SRO's decision concluded the opposite; but, the Court finds, it did so on the basis of conclusory generalities and unsupported assertions, see, e.g., SRO Dec. at 12-13 (holding that because it is "permissible for a school district to contract for the provision of [occupational therapy] in limited circumstances," the provision of such services would not have denied K.O. a free adequate public education under her IEP). This is not the kind of reasoning that passes muster under the MH II test.

There is, however, a more basic problem with this entire analysis, both by IHO and the SRO. The Second Circuit has recently clarified "that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a Burlington/Carter proceeding." R.E. v. N.Y.C. Dep't of Educ., No. 11-1266-cv, 2012 WL 4125833, at *12 (2d Cir. Sept. 20, 2012). The purpose of discouraging reliance on so-called "retrospective" testimony, according to the Second Circuit, is to ensure that parents can

make placement decisions for their children based solely on the information made available to them by the Department at the time of the placement decision. Id. ("A school district cannot rehabilitate a deficient IEP after the fact."). Accordingly, because both the departure of the occupational therapist and the alternative of RSAs (vouchers) to provide the one-on-one therapy were not raised until the impartial hearing was held, well after B.R. sent her rejection letter to the Department and filed her due process complaint seeking tuition reimbursement, it was improper for both the IHO and the SRO to evaluate whether the availability of RSAs in the absence of the occupational therapist afforded K.O. a free appropriate public education.

Accordingly, the Court evaluates whether, at the time B.R. was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP. B.R.'s understanding -- that occupational therapy at the school was provided in a group of six students four days a week, inside the classroom -- was confirmed by the testimony of Christina Proscia, assistant principal of the proposed school, who testified that "per the directive of the District," K.O.'s school would have had in-classroom group therapy as of June 2010. Tr. at 741, 744-45. Plaintiffs therefore argue that the proposed placement would not meet K.O.'s occupational therapy needs under the IEP, and was thus not an adequate placement. Tr. at 1803; Pl. Br. at 10.

In response, the Department argues that the group occupational therapy would have been provided "in addition to, not to the exclusion of, services at other ratios." Defendant's Memorandum of Law in Support of Its Cross Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment dated Mar. 30, 2012 ("Def. Br.") at 16; Tr. at 743 (Proscia testifying that K.O. "would have received" the prescribed one-on-one occupational therapy). During Ms. Proscia's testimony, the IHO noted the "contradict[ion]" between the District policy of group occupational therapy in the school and Proscia's assertion that K.O. would have still received one-on-one occupational therapy. See Tr. at 741-46. When the IHO pressed Proscia on this assertion, asking how many students in the prior school year had been prescribed one-on-one therapy, Proscia testified that she "[did] not have that knowledge," at which point the IHO moved on to other topics. Id. at 745-46 ("If you don't know you don't know . . . ."). The IHO ultimately never made a conclusion on the availability of 1:1 therapy at the start of the 2010-2011 school year, instead premising his finding that the school was inadequate based on the voucher issue, which the IHO found inadequate to meet K.O.'s needs. IHO Dec. at 20.

In the SRO's decision reversing the IHO's findings, the SRO stated that the IHO's conclusion that K.O. would not have received the recommended occupational therapy was "speculative

insofar as the parent did not attend the district's assigned school for the 2010-11 school year." SRO Dec. at 11. The SRO went on to conclude that:

> Moreover, the hearing record does not support the conclusion that had the student attended the assigned school, the district would have deviated from substantial or significant provisions of the student's IEP in a material way and thereby precluded the student from the opportunity to receive educational benefits. Notwithstanding the speculative nature of this argument, I find that the hearing record contains sufficient evidence that the district would have been able to provide the student with [occupational therapy] and address her sensory needs and therefore, I decline to find a denial of a [free appropriate public education] based on a material failure to implement the student's IEP. . . . [T]he hearing record demonstrates that [occupational therapy] was available at the district's assigned school at the beginning of the school year and the school had an occupational therapist on staff at that time. . . . [T]he hearing record indicates that in June 2010 the district had notified the parent of the student's assigned school and that [occupational therapy] was available at the assigned school at that time.

Id. at 11-12 (citations omitted).

These conclusory assertions utterly fail to meet the MH II standard. Notably absent, along with any other particularization, is any discussion whatsoever of the 1:1 issue, let alone any discussion of whether there was sufficient evidence to infer that the school's normal 6:1 in-class occupational therapy was in fact supplemented by any 1:1 outside occupational therapy.

Instead, the SRO, while utterly failing to address the specific evidence actually presented to the IHO on this issue, instead concluded that "the hearing record does not support the

conclusion that had the student attended the assigned school, the district would have deviated from substantial or significant provisions of the student's IEP in a material way." This was not only factually inadequate but also legally erroneous, for it implicitly reversed the burden on the school district to prove that the proposed placement was adequate. See N.Y. Educ. Law § 4404(1)(c); M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Ed., 2010 WL 3398256, at *7 (S.D.N.Y. Aug. 27, 2010). Accordingly, on this central issue, the SRO's decision is entitled to no deference whatsoever. MH II, 685 F.3d at 246.

In fairness, the IHO never reached a decision on this specific issue either.[5] But the Court is persuaded by its own detailed evaluation of the record below that the Department failed to carry its burden of proof that K.O. would have received 1:1 occupational therapy outside the classroom. The only evidence in the record supporting that such occupational therapy would have been provided is the unsubstantiated testimony of Ms. Proscia. When the IHO pressed her on this assertion, he cited two reports from 2009 and 2010 showing that "there was a significant failure of the students attending [Proscia's] institution of receiving appropriate occupational therapeutic services." Tr. at

---

[5] Although plaintiffs argue to the contrary, they confuse the IHO's findings with its mere statement of plaintiffs' position. See Plaintiff's Memorandum of Law in Opposition to Defendant's Cross Motion for Summary Judgment dated May 4, 2012 ("Pl. Opp. Br.") at 3 (citing IHO Dec. at 7 as IHO's finding that in fact

742 (citing Parent's Exs. H & I). Proscia's initial non-responsive answer was that the building K.O. was assigned to was "fully serviced." Id. But when the IHO further pressed Proscia on how many students were prescribed and received 1:1 occupational therapy in addition to the District-imposed group occupational therapy, Proscia's seemingly evasive answer was that she did not have that knowledge. Id. at 743-45. Bare, unsubstantiated, conclusory assertions are far from sufficient for the Department to carry its burden on this issue when, if in fact 1:1 therapy was offered, it could have been easily ascertained. Moreover, Proscia confirmed B.R.'s testimony that B.R. had been told by the public school that K.O. would receive group therapy in a 6:1 setting, in the classroom (without any mention of 1:1). Id. at 741, 746.

The Court concludes that the Department failed to carry its burden of showing that K.O. would receive the 1:1 out-of-class occupational therapy set forth in the IEP's recommendation. The Court also defers to and adopts the IHO's reasoned conclusion, based on the exhibits and testimony presented to him, that K.O. needed the school to provide the IEP-recommended 1:1 occupational therapy in order to make progress in her education. IHO Dec. at 20; see also M.H. v. N.Y.C. Dep't of Educ. (M.H. I), 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d

---

merely quoted the parties' positions).

Cir. 2012) (rejecting SRO's conclusion as insufficiently reasoned and deferring to IHO's conclusion that 6:1:1 placement "could not provide the 1:1 [placement] that constituted an appropriate education for P.H."). Accordingly, the Court finds that the proposed placement as shown to B.R. in June 2010 was substantively inappropriate under the IDEA and constituted a denial of a free appropriate public education.

Since the Court concludes that the failure to provide K.O. with her IEP-recommended occupational therapy meant that the public school placement was legally inadequate, it need not reach the other objections lodged by plaintiffs against the proposed public school alternative, and instead moves to step two of the Burlington-Carter test: whether the private school placement was appropriate to the student's needs. Frank G., 459 F.3d at 363. Although the Department initially disputed the appropriateness of the Rebecca School as an educational facility, the IHO found the Rebecca School to be an appropriate placement, IHO Dec. at 21-22, and the Department chose not appeal that determination, SRO Dec. at 10. Accordingly, that determination is final and binding on the Department. Id. (citing 34 C.F.R. § 300.514(a); 8 N.Y.C.R.R. § 200.5(j)(5)(v)).

Turning to step three of the Burlington-Carter test, the Court must determine whether equitable considerations support B.R.'s claim for tuition reimbursement. Frank G., 459 F.3d at

363. The IHO determined that "[t]hroughout this matter, the parents attended each and every IEP meeting and issued every consent form requested of them by the Department. There is no allegation that the parents failed to produce any document or failed in the presentation of any requested information." IHO Dec. at 20-21. Accordingly, the IHO concluded that "[t]he parents clearly identified their intention to have the student return to the Rebecca School. They raised no objection to the twice deferred placement actions of the [Department]. I find the parents have met their responsibility to cooperate with the [Department] and thereby met their [Burlington-Carter] prong 3 equity obligations." Id. at 21. The SRO did not review this determination on the administrative appeal; the Court thus must give appropriate deference to the IHO's reasoning. See N.Y.C. Dep't of Educ. v. V.S., No. 10-CV-05120, 2011 WL 3273922 (E.D.N.Y. July 29, 2011) (holding IHO determination is due "equal deference" to SRO decisions when the SRO does not address an issue reached by the IHO) (citing Gagliardo, 489 F.3d at 113 & n.2).

Seeking to overcome this deference, the Department now argues that the IHO erred in concluding that K.O.'s parents cooperated in the IEP and placement process. The Department argues that if, as B.R. represented at the January 26, 2010 meeting, the parents' plan was to reenroll K.O. at the Rebecca

School the entire time, B.R's "actions taken thereafter – attending additional meetings with the Committee on Special Education, visiting the recommended placement – were not taken in a sincere effort to develop a public program for [K.O.], but were apparently only taken in furtherance of their desire to be reimbursed for a private school education." Defendant's Reply Memorandum of Law in Further Support of Its Cross Motion for Summary Judgment dated May 25, 2012 ("Def. Reply Br.") at 7; see J.P. v. N.Y.C. Dep't of Educ., No. CV 10-3078 (ERK) (MDG), 2012 WL 359977, at *13-14 (E.D.N.Y. Feb. 2, 2012) (finding bad faith on the part of the parents in IEP process and declining to award tuition reimbursement).

The Court disagrees. As the IHO noted, the parents worked with the Department at every step of the of the placement process. They made their desire to keep K.O. at the Rebecca schools known, but did not make it an absolute condition. When the Department continued to adjust the IEP twice more after the initial January meeting, they cooperated and participated in the process by, for example, requesting a limited travel time accommodation. Tr. at 1722. Four months after the initial meeting, having still not received a public school placement to evaluate, the parents paid the tuition deposit at the Rebecca School to avoid K.O. losing her spot. Once they received the proposed public school placement two weeks later, B.R. visited

the school, and gave no indication that she was not cooperating with the school system or participating as only a sham to obtain tuition reimbursement. See id. at *13-14. When B.R. visited the public school and asked questions, however, she discovered, inter alia, that the school likely would not provide 1:1 out-of-class therapy. It was only then that she sent the Department a formal rejection (dated September 20, 2010) and filed her due process complaint for tuition reimbursement.

Nothing in the factual record supports a claim of bad faith on the part of the parents, and the Court sees no reason to overturn the judgment of the IHO, who conducted the in-person hearings and interacted with the relevant players, that there was no such bad faith. The Court likewise rejects the Department's complaint that they were not given sufficient notice of B.R.'s intent to reenroll K.O. at the Rebecca School, and agrees with the IHO that the Department was aware of B.R.'s preferences throughout the IEP process. See IHO Dec. at 20-21; 20 U.S.C. § 1412(a)(10)(C)(iii)(aa)-(bb). The fact that the Department dragged its feet in giving B.R. its placement recommendation until after the deadline by which B.R. had to pay K.O.'s tuition deposit in order to keep K.O.'s existing school as an option is not an equitable factor that cuts in favor of the Department or in overturning the IHO's decision. See also W.M., 783 F. Supp. 2d at 505 ("[A] failure [to provide notice] is not an automatic bar

to reimbursement; the IDEA simply states that failure to do so "may" be grounds for denying or reducing reimbursement, leaving the matter to the Court's informed discretion."). In sum, the Court agrees with the IHO that equity favors awarding B.R. tuition reimbursement.

Accordingly, the Court reaffirms its "bottom-line" Order dated August 22, 2012, granting plaintiffs' motion for summary judgment, and denying defendant's cross-motion for summary judgment, and finds that plaintiffs are entitled to be reimbursed by defendant for tuition expenses for the 2010-2011 school year. Additionally, pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), the Court will award reasonable attorneys' fees and costs to plaintiffs. Plaintiffs are hereby directed to file with the Court by no later than January 15, 2013, their particularized request for reasonable attorneys' fees and costs, together with supporting documentation, that complies with 20 U.S.C. § 1415(i)(3)(C). Defendant may file any objections thereto by January 29, 2013, after which the Court will issue its final judgment.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
December 26, 2012